In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-3670

ELISA J. YOCHIM,

*Plaintiff-Appellant*,

*v.*

BENJAMIN S. CARSON, SR.,
Secretary, U.S. Department of Housing and Urban
Development,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-4926 — **Harry D. Leinenweber**, *Judge*.

ARGUED JULY 9, 2019 — DECIDED AUGUST 15, 2019

Before KANNE, HAMILTON, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Elisa Yochim worked in the legal
department of the United States Department of Housing and
Urban Development for 26 years. Throughout her tenure, she
took full advantage of HUD's flexible and progressive policy
permitting employees to work from home several days per
week. After undergoing hand surgery, Yochim requested time

off and permission to work from home. HUD agreed and allowed her time to recover and to telework several days a week for many months as she received physical therapy. HUD later restructured its law department and this development had the effect of requiring employees like Yochim to spend more time in the office. In time this restructuring, combined with Yochim's performance deficiencies, led HUD to revoke her telework privileges and offer alternative accommodations. For her part, Yochim responded with this lawsuit, alleging violations of the Rehabilitation Act for failure to accommodate her ongoing rehabilitation needs. The district court entered summary judgment for HUD, and we affirm. No rational jury could conclude that the Department failed to offer reasonable accommodations.

## I

In reviewing the district court's award of summary judgment to HUD, we construe the facts in the light most favorable to Yochim as the nonmovant, resolving evidentiary conflicts and competing inferences in her favor. See *Brown v. Milwaukee Bd. of Sch. Dirs.*, 855 F.3d 818, 820 (7th Cir. 2017).

Yochim worked as a HUD attorney for 26 years, serving in the Chicago office for the last 15 years before her retirement in May 2015. During her tenure, the Department maintained a forward-leaning telework policy that allowed full-time employees to work from home up to three days a week at their manager's discretion.

Beginning in October 2012, HUD's legal department underwent a functional reorganization. Before this change, the Department's attorneys tended to specialize in particular areas. With the reorganization, however, HUD wanted its

attorneys to work more as generalists and to assist each other through cross-training and collaboration—a change in approach less suited to telework. Yochim's job description changed to include "training, orientation, [and] working groups" as well as "administrative responsibilities," including "space and file management," as areas of focus. Around this same time, Yochim applied for a supervisory position, but the Department passed her up and instead awarded the role to Lisa Danna-Brennan, who became Yochim's supervisor. This development was not one Yochim welcomed.

In November 2012, Yochim had surgery to treat carpal tunnel syndrome in her right hand. The surgery brought with it a recovery and rehabilitation process, prompting Yochim to submit several requests to HUD to accommodate her needs. The HUD handbook outlines the Department's process for accommodating such requests. Employees can seek reasonable accommodations through their immediate supervisor or the Department's Reasonable Accommodation Branch. The supervisor and employee then engage in an interactive process to identify an accommodation, and the Reasonable Accommodation Branch facilitates this communication. The Branch determines an employee's eligibility for a reasonable accommodation, while the supervisor shoulders responsibility for deciding what accommodation is suitable.

Yochim submitted her first accommodation request in December 2012, asking her supervisor, Danna-Brennan, to permit her to telework during the eight days in December on which she had not already scheduled leave and all of January. To support her request, Yochim submitted two work-status forms from her surgeon. In the first form, the doctor identified no work or functional limitations while adding that Yochim

"may work from home until the end of January." The doctor's second form conveyed a work-related limitation, explaining that Yochim had "diminished right-hand strength and should not rely on gripping with that hand until February 1, 2013; specifically, riding public transportation that requires holding on with her right hand may be a safe[t]y concern."

Danna-Brennan approved Yochim's request to work from home the remainder of December. As for Yochim's request to telework throughout January, Danna-Brennan offered a compressed schedule consisting of four ten-hour days—two in the office and two at home. Danna-Brennan also afforded Yochim the flexibility to "set her schedule to reflect her need to avoid rush hour" if she maintained a set daily schedule. Apparently unhappy that her compressed schedule still required her to come to the office two days a week, Yochim later complained to Danna-Brennan that she had to use sick leave to stay home these extra two days per week. At no point, however, did Yochim explain why HUD's accommodation would interfere with ongoing and medically necessary rehabilitation or physical therapy. Nor did Yochim suggest other accommodation options.

In March 2013, Yochim submitted a second request to work full-time from home until June 30 to accommodate her ongoing recovery from surgery. She supported this request with a letter from her primary-care physician, Dr. Lexy Wistenberg, who reported that she continued to experience pain and swelling in her right hand. Dr. Wistenberg also advised that Yochim may need to avoid commuting during rush hour to avoid getting stuck standing in a train aisle and needing to grasp a handrail. Otherwise, however, Dr. Wistenberg

cleared Yochim to work as she continued her physical therapy.

In April 2013, while the second accommodation request was pending, Danna-Brennan placed Yochim on a sick-leave restriction. This restriction required Yochim to provide a doctor's note with the date and time of an appointment or any anticipated medical care and to schedule medical appointments at the beginning or end of the day to have the least impact on the workday. This new restriction resulted from Danna-Brennan's determination that Yochim had a history of excessive absences from work—an audit of Yochim's time revealed that she had taken leave on 339 days out of a possible 1,010 work days between January 1, 2009 and May 1, 2013—and that she often took leave without any prior approval.

A month later, in May 2013, HUD responded to Yochim's second accommodation request. The Department offered voice-recognition software to reduce Yochim's need to type and the option to telework three days per week. The accommodation called for Yochim to work in the office two days per week while allowing her to work from home for two hours in the morning on these days to avoid commuting during rush hour. HUD also permitted her to leave work 15 minutes early to secure seating on the train. Yochim agreed to this revised schedule and concedes that it reflected an effective accommodation. This accommodation lasted approximately one month, expiring in June 2013.

A year later, in June 2014, Danna-Brennan revoked Yochim's telework privileges and issued a written reprimand for performance deficiencies. Danna-Brennan decided the reprimand was warranted based on the results of an audit of the legal team's docket. The audit revealed that Yochim had

left particular assignments incomplete for up to two years without ever reporting the delays, despite HUD's policy requiring her to do so.

In August 2014, Yochim submitted a third accommodation request seeking to telework three days per week for six months plus two additional days per week "as needed due to pain, medical appointments, and recovery." She supported this request with another letter from Dr. Wistenberg who reported that Yochim had inflammatory osteoarthritis, causing "significant pain and stiffness" and swollen joints throughout her body. Dr. Wistenberg recommended that Yochim work from home at least three days per week to minimize the risks of further discomfort from commuting and to accommodate visits to physical therapists near her suburban home. Yochim never inquired about attending physical therapy in downtown Chicago near HUD's office.

Danna-Brennan responded by offering a list of alternative accommodations including an ergonomic assessment, additional paralegal assistance to reduce Yochim's typing, a compressed weekly schedule, and generous leave approval. In doing so, Danna-Brennan explained that Yochim working from home was no longer an acceptable accommodation "because [her] telework was suspended as a result of performance deficiencies while teleworking 3 days a week." Yochim expressed her disagreement with the proposed arrangement by filing a written statement with a specialist in HUD's Reasonable Accommodation Branch. The specialist then informed Yochim of the procedures to seek reconsideration, but she never did so.

During the same period, after the restructuring of HUD's legal department, Yochim lodged two complaints with the

Equal Employment Opportunity Commission. She alleged that HUD discriminated and retaliated against her by failing to promote her and, separately, to accommodate her need for ongoing rehabilitation.

Yochim retired from HUD once she became eligible to do so in May 2015. She then filed this suit, advancing claims under the Rehabilitation Act and alleging that HUD failed to accommodate her requests to telework and to engage in the interactive process promptly and in good faith. Yochim also alleged that HUD retaliated against her for filing her EEO complaints and subjected her to a hostile work environment by restricting her telework and sick-leave privileges.

The district court granted HUD's motion for summary judgment, concluding that although Yochim had established that she was a qualified person with a disability, no reasonable jury could find that the Department had failed to offer reasonable accommodations. The district court found that HUD's alternative accommodations were reasonable given the need that arose for Yochim to work in the office several days a week as a result of the Department's restructuring of its legal department. The district court also determined that Yochim fell short in her efforts to show that HUD retaliated against her or subjected her to a hostile work environment.

## II

On appeal Yochim argues that she brought forth enough evidence to get to a jury on her allegations that HUD did not reasonably accommodate her because it offered only ineffective accommodations and failed to engage in the interactive process in good faith. We review a district court's entry of

summary judgment *de novo* and must affirm if no reasonable juror could find in favor of Yochim. See *Brown*, 855 F.3d at 820.

Yochim brought her claims under the Rehabilitation Act. This enactment mandates that no qualifying individual with a disability "shall, solely by reason of her or his disability" experience discrimination by an executive agency. 29 U.S.C. § 794(a). To prevail on her claim of discrimination, Yochim must show that (1) she was a qualified individual with a disability, (2) HUD was aware of her disability, and (3) the Department failed to reasonably accommodate her disability. See *Sansone v. Brennan*, 917 F.3d 975, 979 (7th Cir. 2019); see also *Ozlowski v. Henderson*, 237 F.3d 837, 839 (7th Cir. 2001) (explaining that the Rehabilitation Act adopted the standard for determining whether a violation has occurred from the Americans with Disabilities Act). The accommodation obligation embodied in the third prong brings with it a requirement that both the employer and the employee engage in a flexible "interactive process" and make a "good faith effort" to determine what accommodations are necessary. See *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786 (7th Cir. 2016).

## A

We agree with the district court that no rational jury could find that HUD failed to offer Yochim reasonable accommodations or engage in the interactive process in good faith. The Department either granted each of Yochim's requests or responded with a list of alternative options that reasonably addressed her needs. Nor does the record support Yochim's contentions of bad faith. This is not a case where an employee's requests for accommodations fell on deaf ears. To the contrary, the parties engaged in a meaningful back-and-forth with Yochim requesting to work from home and HUD

presenting her with appropriate alternative accommodations. The communication process did not break down simply because Yochim did not receive the answers she had hoped for.

Start with the period following Yochim's surgery. HUD granted her request to telework for the eight remaining days in December 2012 that she had not already requested off. The Department also permitted her to adjust her work hours (to avoid having to stand on a train) and to telework two days a week for the entirety of January. While this fell short of Yochim's preference to work from home all of January, an employer must provide a "reasonable accommodation, not the accommodation [the employee] would prefer." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012). Given the Department's restructuring and Yochim's updated job description focusing on cross-training, teamwork, and collaboration, which necessarily required her presence in the office, HUD's accommodations were entirely reasonable. And recall that the only medical basis for Yochim's request to work from home in January 2013 was her surgeon's concerns about Yochim's commute on crowded trains and her need to attend therapy appointments. HUD's alternative options reasonably addressed these concerns by adjusting her work hours to avoid rush hour and limiting—but not eliminating—her time in the office.

Now consider HUD's response to Yochim's August 2014 request to work from home three to five days per week for six months. HUD offered her a four-day work week, generous leave approval (to ease commuting and attending physical therapy), and other accommodations. The Department did so attentive to the needs of its legal department in Chicago and mindful that Yochim, although medically cleared for work,

had ongoing needs for physical therapy. So, too, did HUD determine that further telework was not warranted given Yochim's performance deficiencies. No reasonable jury could find this response unreasonable. Yochim has never explained why HUD's approval of regular sick leave to attend physical therapy appointments was inadequate. And not once has Yochim identified any reason why she could not attend therapy appointments closer to her Chicago office to minimize her commute or why changes to her work hours would not resolve her concern about crowded trains. Put most simply, Yochim failed to connect the accommodation she persisted was necessary with what the record showed were her ongoing medical needs. In the end, it was Yochim's own insistence on teleworking three or more days a week and her refusal to remain open to anything less that doomed the interactive process.

Yochim's claim that HUD failed to offer her reasonable accommodations fails for another reason. She cannot point to evidence that the two accommodations she sought but did not receive—to telework full-time for one month and later for three to five days per week for six months—were "reasonable on [their] face." See *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014) (quoting *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013)) (stating that a plaintiff seeking to establish claim for failure to accommodate under the ADA must "make an initial showing that the accommodation she sought was 'reasonable on its face'"). Yochim insists that her requests to telework were appropriate because she had worked from home full time for six weeks in 2004, HUD's telework policy allows employees to work from home up to three days a week, and another employee was allowed to work from home for an unknown period of time.

Yochim's position falls short. An accommodation to telework requires a context-specific inquiry, and a "general consensus [exists] among courts" that jobs "often require face-to-face collaboration." See *Bilinksy v. Am. Airlines, Inc.*, 928 F.3d 565, 573 (7th Cir. 2019). Yochim has failed to counter HUD's evidence that she held just such a job. The 2012 restructuring of the legal department, which changed Yochim's responsibilities and job description, required attorneys to work in teams, collaborate more, and cross-train each other. She points to the Department's 2010 telework policy that allows telework up to three days a week, but this policy predates the restructuring. Even more to the point, the policy, by its terms, is subject to management's discretion—it does not confer a legally protected entitlement upon an employee.

B

Yochim next argues that HUD's accommodations were ineffective. She says, for example, that many of HUD's options (like the compressed work week and the flexibility to telework a few days a week) already were widely available to HUD employees without a reasonable accommodation and thus were not "alternative accommodations." But this position misses the mark. "Reasonable accommodation" under the relevant statutes includes "modified work schedules" such as the compressed schedules and telework that HUD offered. See *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) (citing 42 U.S.C. § 12111(9)(B)). It makes no difference that modified scheduling options might have been available to other HUD employees who obtained permission to telework from their manager.

By way of another example, Yochim contends that HUD's options were ineffective because requiring her to work in the

office meant that she had to commute on the train and grasp the handrails with her injured right hand. But the medical records supporting Yochim's accommodation requests demonstrated that the only limitation related to her commute was the need to avoid crowded trains that could cause her to fall or force her to grip the railings. HUD's proposed accommodations addressed these concerns by offering her an adjusted schedule to avoid rush hour.

Yochim has offered a few other views as to why HUD's accommodations were ineffective. She claims that the long ten-hour days of her compressed schedule (and HUD's requirement that she maintain a set daily schedule) limited her flexibility to make her therapy appointments before or after work, necessitating that she take sick leave. And she says that doing so was especially difficult with the sick-leave restriction imposed by her supervisor. But one purpose of paid sick leave is to allow employees to attend such appointments, and Yochim does not present any evidence that the leave restriction—which merely required her to submit a medical note detailing the time and date of an appointment—interfered with her physical-therapy sessions. None of Yochim's remaining arguments persuade us that a reasonable jury could find that the Department's accommodations were ineffective.

## C

Finally, Yochim contends that HUD's refusal to allow her to work from home and the imposition of her sick-leave restriction created a "retaliatory hostile work environment" that led to her premature retirement. This court has not determined whether the ADA (and by extension, the Rehabilitation Act) encompasses claims of a hostile work environment.

See *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 712–13 (7th Cir. 2000). We need not resolve the question here. Even assuming Yochim could bring a hostile-work-environment claim, she must at a minimum demonstrate that the work environment was both objectively and subjectively offensive because of "severe or pervasive" harassment. *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016).

At summary judgment, Yochim did not offer evidence showing that her leave and telework restrictions—actions that are permissible for an employer to take—were so severe or pervasive as to "alter the conditions" of employment and "create an abusive working environment." See *id.*; see also *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (concluding that empr's disciplinary action for performance issues was "normal workplace friction"). And it is this evidentiary shortcoming that defeats this dimension of her claims on summary judgment.

For all of these reasons, we AFFIRM.