In the

# United States Court of Appeals
## For the Seventh Circuit

───────────────

No. 24-2794

37CELSIUS CAPITAL PARTNERS, L.P. and 37CELSIUS CAPITAL
PARTNERS, LLC,

*Plaintiffs-Appellants*,

*v.*

INTEL CORPORATION,

*Defendant-Appellee.*

───────────────

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:20-cv-00621 — **William E. Duffin,** *Magistrate Judge.*

───────────────

ARGUED MAY 21, 2025 — DECIDED DECEMBER 23, 2025

───────────────

Before LEE, KOLAR, and MALDONADO, *Circuit Judges*.

KOLAR, *Circuit Judge*. 37celsius Capital Partners and Intel
reached a preliminary agreement—set forth in a term sheet—
for 37celsius to purchase one of Intel's subsidiary companies,
Care Innovations. After 37celsius did not come up with the
agreed-upon purchase price by the closing date specified in
their agreement, Intel sold the company to another party.
37celsius now seeks to recover damages for the unsuccessful

transaction, but it has not shown that the deal fell through for any reason other than its own failure to secure funding.

Delaware law, applicable here, recognizes that some preliminary agreements can be binding, and distinguishes between two types of binding preliminary agreements. "Type I" agreements are firm obligations where the parties agree on all terms and contemplate memorializing the agreement in a formal document, while "Type II" agreements reflect the parties' "commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement." *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 349 (Del. 2013) (quoting *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)).

37celsius argues that the term sheet was a Type II preliminary agreement, under which a party can recover expectation damages for breach under Delaware law. But the plain language of the term sheet does not create any mutual obligation for the parties to continue negotiating with one another. Instead, it clearly sets out the terms of a proposed deal, contingent on due diligence and 37celsius paying the agreed-upon amount.

Most importantly, even if the term sheet was a Type II agreement and Intel breached, 37celsius cannot show that any breach was the but-for cause of the deal's failure, as is required to recover expectation damages. Separately, a non-disclosure agreement signed by the parties prohibits recovery of expectation damages. And while no agreement of the parties bans reliance damages, 37celsius does not appeal the district court's finding that it suffered no reliance damages. Thus, without proof of any damages—expectation and

reliance damages are the only possible damages at issue—
37celsius's breach of contract claim fails as a matter of law.

## I. Background

Plaintiff 37celsius is a Milwaukee-based firm that develops healthcare-related businesses and technologies; its principal is Alexander Kempe. In 2016, Defendant Intel was considering selling Care Innovations, LLC ("Care"), and 37celsius was one of the interested buyers. The talks became more serious, and the parties executed a non-disclosure agreement ("the NDA") so they could attempt to negotiate the terms of a deal. The NDA had a "Hold Harmless" provision that prohibited either party from recovering "incidental, consequential, special or speculative damages, lost profits or loss of business, in connection with not moving forward to conclusion of the ... negotiations." After signing the NDA, Kempe proposed that Intel grant 37celsius exclusivity, saying that 37celsius had "a good backing for funds" and was ready to close the deal before February 14, 2017.

On January 31, 2017, the parties drafted a term sheet setting out "the key terms and conditions of a proposed transaction" by which 37celsius would "acquire" Care: 37celsius and Intel would form a holding company—funded by 37celsius's cash contributions—and Intel would transfer control of Care to the newly-formed holding company. The transaction required a $12 million contribution from 37celsius paid directly to the holding company. The document stated that the transaction would close "[n]o later than February 14, 2017." But the terms were confidential and "subject to" the NDA, "which continue[d] in full force and effect," and the term sheet would automatically terminate upon "(a) the execution of a definitive purchase agreement by [37celsius] and Intel, (b) mutual

agreement of [37celsius] and Intel [or] (c) written notice of termination of [the] term sheet by Intel, provided such termination notice shall be effective no earlier than February 2, 2017."

Intel also granted 37celsius an "Exclusivity Period" in the term sheet. Until the term sheet "terminated," Care and Intel could not talk to any other party about acquiring Care, provide non-public information regarding an acquisition, or "enter into any agreement, arrangement or understanding requiring it to abandon, terminate or fail to consummate the Transaction with [37celsius]." The provision noted that exclusivity was granted "[i]n consideration of the expenses that [37celsius] has incurred and will incur in connection with the Transaction."

The term sheet was explicit in limiting the parties' obligations and liabilities arising from its terms. Excepting the Confidentiality, Exclusivity, Governing Law, and Third-Party Beneficiaries provisions, the agreement did not "give rise to any legally binding or enforceable obligation on any party" and provided that "[n]o contract …shall be deemed to exist between [37celsius] and Intel" until a final agreement was reached. And in a provision titled "No Reliance," the term sheet explicitly disclaimed that it created any continuing obligations on the parties:

> The parties understand that neither this Term Sheet nor any negotiations or discussions between any party obligates either party to enter into any further agreement. Moreover, unless and until the parties sign and deliver a definitive agreement with respect to a particular transaction, neither party will be under any legal obligation of any kind whatsoever

> regarding any transaction by virtue of this Term
> Sheet or any written or oral expression with re-
> spect to any transaction … by any of the parties
> or their representatives except for the matters
> specifically agreed to in this Term Sheet.

In the event of termination before a final agreement, only the Confidentiality, Governing Law, Third Party Beneficiaries, and Non-Binding Nature provisions would continue to bind the parties.

Intel and 37celsius signed the final transaction documents and a letter agreement, providing the signature pages would be held in escrow until 37celsius gave sufficient proof of funds. Intel had "sole and absolute discretion" to decide whether 37celsius had provided "confirmation satisfactory to Intel … that 37celsius will meet the Financial Obligation" outlined in the term sheet, i.e., pay the $12 million cash. If Intel did not receive satisfactory proof of funds by February 14, 2017, then the letter agreement provided that upon "written notice from Intel … the advance copies of the signature pages shall be returned to the respective Parties that provided them," the transaction documents would not become effective, and "the Closing shall not occur."

37celsius never came up with the funds. On February 14, 2017, Intel wrote 37celsius that it had not received satisfactory proof of funds and, pursuant to the letter agreement, it was notifying 37celsius the closing would not occur. Intel and 37celsius discussed pushing back the closing to February 21, but again 37celsius didn't have the money lined up in time. Unable or unwilling to pay the agreed-upon price, Kempe later proposed a different deal in which 37celsius would pay only $6.5 million in cash and the new holding company for

Care would finance an additional $4 million. Intel, in the meantime, was speaking with another private equity firm and on March 1, 2017, Intel told Kempe that it had closed with the other firm. Kempe wrote a partner, "We lost the deal … a real bummer, but we were in a competitive bid situation and that's the risk you take."

Nearly two years later, 37celsius filed this suit against Intel and Care in Wisconsin state court, and Defendants removed it to federal court one year later.[1] Defendants moved for a ruling that 37celsius was not entitled to expectation damages, i.e., "lost profits and value from the lost acquisition of Care," which the district court granted. Following expert discovery, Defendants moved for summary judgment. The district court granted judgment to the Defendants and this appeal followed.[2]

## II. Discussion

We review *de novo* the entry of summary judgment. *Thompson Corrugated Sys., Inc. v. Engico, S.R.L.*, 111 F.4th 747, 751 (7th Cir. 2024). "At the summary judgment stage, we construe the record and all reasonable inferences that may be

---

[1] We note that a defendant must generally remove a case within 30 days of being served the complaint. 28 U.S.C. § 1446(b)(1). But 37celsius has waived any procedural defect in the timeliness of Defendants' removal and our subject-matter jurisdiction is not "imperil[ed.]" *See Pettitt v. Boeing Co.*, 606 F.3d 340, 343 (7th Cir. 2010). Diversity jurisdiction exists because Plaintiffs are all citizens of Wisconsin and Defendants are citizens of California and Delaware; the amount-in-controversy was over $75,000 at the time of removal. 28 U.S.C. § 1332(a)(1).

[2] On appeal, the breach of contract claim against Intel is the sole claim at issue. For that reason, we have removed Care Innovations from the caption. *See Dotson v. Faulkner*, 138 F.4th 1029, 1030 (7th Cir. 2025).

drawn from it in the light most favorable to the nonmoving party." *Id.* Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive a motion for summary judgment, "[t]he nonmoving party must provide specific material facts showing there is a genuine issue for trial." *Tech. Sec. Integration, Inc. v. EPI Techs., Inc.*, 126 F.4th 557, 560 (7th Cir. 2025) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

37celsius brought this breach of contract claim on the theory that Intel breached the term sheet by communicating with third parties during the Exclusivity Period. Both the term sheet and the NDA are expressly governed by Delaware law. Under Delaware law, a breach of contract claim requires "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *Humanigen, Inc. v. Savant Neglected Diseases, LLC*, 238 A.3d 194, 202 (Del. 2020) (citation omitted).

Delaware law instructs a court interpreting a contract to "read the agreement as a whole and enforce the plain meaning of clear and unambiguous language." *BitGo Holdings, Inc. v. Galaxy Digital Holdings, Ltd.*, 319 A.3d 310, 322 (Del. 2024) (citation omitted). Delaware follows the "objective theory of contracts," which asks "what a reasonable person in the position of the parties would have thought it meant." *Id.* (citation omitted). "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Daniel v. Hawkins*, 289 A.3d 631, 645 (Del. 2023) (citation omitted).

Here, 37celsius's claim relies upon the term sheet being an enforceable preliminary agreement to negotiate—a Type II

agreement under Delaware law—that bound Intel to continue to negotiate even after 37celsius failed to produce the funds. The claim fails for three reasons: the unambiguous language of the term sheet does not bind the parties to negotiate, Intel's breach was not the but-for cause of the deal falling apart, and 37celsius has presented no evidence of damages.

## A. The Term Sheet is Not a Type II Preliminary Agreement.

It is often the case that parties enter into preliminary agreements before they sign the contract that effectuates their deal. "Under the traditional rule, the absence or indefiniteness of material terms generally rendered [such preliminary agreements] unenforceable." *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 761 (Del. 2022). In *SIGA Technologies, Inc. v. PharmAthene, Inc.*, however, the Delaware Supreme Court recognized two "types" of preliminary agreements that are enforceable. The first, a "Type I" agreement, is "created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document." *SIGA*, 67 A.3d at 349 n.82 (citation omitted). It is fully binding on both parties. *Id*. A "Type II" agreement, on the other hand, exists "when [the parties] agree on certain major terms, but leave other terms open for further negotiation." *Id*. (citation omitted).

Type II agreements are binding in a more limited sense than Type I preliminary agreements—Type II bind the parties only to negotiate in good faith. *Id*. And where "the parties would have reached an agreement but for the defendant's bad faith negotiations, the plaintiff is entitled to recover contract expectation damages." *Id*. at 350–51.

37celsius argues that the term sheet was a Type II agreement, binding Intel to negotiate in good faith and affording 37celsius the right to expectation damages in the event of breach. We follow the approach of Delaware courts and look to the language of the term sheet to determine whether it reflects a mutual intent to be bound to negotiations by the parties. *See Cox*, 273 A.3d at 761.

In this case, the language of the term sheet does not reflect that the parties agreed to be mutually bound to negotiate with one another in good faith towards a final deal. The term sheet makes clear that it is outlining a "proposed transaction," which is subject to due diligence by the parties and the execution of "a definitive purchase agreement." The terms of the deal are fully laid out—that 37celsius will pay $12 million for a 70% stake in the newly-created holding company for Care. There is very little left for the parties to negotiate regarding the deal.

Most importantly, the term sheet explicitly disclaims that it is creating any lasting obligation to enter into a final agreement: "[N]either party will be under any legal obligation of any kind whatsoever regarding any transaction by virtue of this Term Sheet or any written or oral expression with respect to any transaction … except for the matters specifically agreed to in this Term Sheet." And the term sheet states that it does not "give rise to any legally binding or enforceable obligation on any party," except for four provisions that do not address future negotiations between the parties. Contrast that with the merger agreement in *SIGA*, which stated, "SIGA and PharmAthene will negotiate in good faith with the intention of executing a definitive License Agreement in accordance with the terms set forth in the License Agreement Term

Sheet." 67 A.3d at 337–38. That language—an explicit agreement to negotiate—is absent from this case.

To be sure, an explicit good-faith provision is not necessary to find a binding Type II agreement, but the parties must indicate that they agree to continue negotiations with one another. *See Cox*, 273 A.3d at 760–61. In *Cox*, the contract had no good-faith provision, but the parties agreed that Cox would "enter into a definitive ... agreement with a Sprint Affiliate … on terms to be mutually agreed upon between the parties." *Id.* at 761. That was sufficient evidence that the parties intended to be bound to negotiate further. *Id*. But again, there is no such language here; the term sheet itself sets out everything the parties could potentially negotiate (transaction structure, price, closing date, etc.).

Finally, 37celsius suggests that the very fact the parties included an Exclusivity Provision means that the term sheet is a Type II agreement. It points to no case that establishes such a rule, and the cases it does reference are distinguishable. For example, the exclusivity provision in *Cambridge Capital LLC v. Ruby Has LLC* was part of an agreement that stated it was "an expression of mutual intent to proceed with the drafting of the share purchase agreement and collateral documents contemplated hereby in accordance with the principles stated herein." 565 F. Supp. 3d 420, 441, 443 (S.D.N.Y. 2021) (applying Delaware law). On a motion to dismiss, the district court found that language, *combined with* an exclusivity provision, was sufficient to allege a breach of the covenant of good faith. *Id*.at 445–46 ("In the face of *all of these provisions*, it is plausible that Cambridge Capital had a duty to negotiate in good faith …." (emphasis added)). But given the different contractual

language and procedural posture, *Cambridge Capital* is not instructive here.

The plain language of the term sheet indicates that if 37celsius paid Intel $12 million by February 14, 2017, then Intel would have transferred the controlling shares of Care into 37celsius's control. But nothing in the plain language of the agreement evinces an obligation to do anything else. The term sheet is not a Type II agreement; it did not create an "obligation to negotiate the open issues in good faith." *SIGA*, 67 A.3d at 349 (citation omitted).

### B. 37celsius Cannot Show Causation.

Even if the term sheet were a binding Type II agreement, 37celsius did not submit any evidence upon which a reasonable jury could rely to find that it was damaged by Intel's alleged breach.[3] *SIGA* set out two requirements to recover expectation damages from a breach of a Type II agreement—(1) a "preliminary agreement to negotiate in good faith" and (2) "a factual finding … that the parties would have reached an agreement but for the defendant's bad faith negotiations." 67 A.3d at 350–51. There is no evidence in the record to support a finding that but for Intel's alleged breach, 37celsius and Intel would have gone through with their deal.

Critically, 37celsius's failure to transfer the necessary funds was the reason the deal did not go through. It is undisputed that 37celsius did not have $12 million on February 14, the date the term sheet set as the last possible date for closing.

---

[3] We make no ruling on whether the Exclusivity Provision was breached because the lack of causation and damages resolves the claim. Intel admitted at oral argument that for purposes of the appeal, Care had breached the Exclusivity Provision. Oral Arg. at 33:34–34:32.

While the parties discussed pushing the closing date to February 21, it is also undisputed that 37celsius did not have $12 million on hand by that date either. Indeed, 37celsius admitted it never had sufficient funds to meet its obligations under the term sheet.

Instead, 37celsius proposed a very different deal where it would only have to come up with $6.5 million and have the new Care holding company finance another $4 million. At most, 37celsius could show that it was ready to proceed with a deal that was different from that outlined in the term sheet. But that puts us outside *SIGA*, which requires the parties to work toward a deal "within the agreed framework." 67 A.3d at 349. Intel was not required to agree to a deal with 37celsius on different terms than those set out in their earlier agreement. "[T]he scope of any obligation to negotiate in good faith can only be determined from the framework the parties have established for themselves in their [preliminary agreement]." *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chem. Grp., Inc.*, 873 F.2d 155, 159 (7th Cir. 1989) (applying substantively similar Illinois law and finding a binding preliminary agreement but no breach).

There is simply no dispute of fact regarding the reason the deal fell apart. 37celsius has not provided evidence upon which a reasonable jury could rely to find that Intel's alleged breach was the cause. Instead, the record is clear—37celsius did not buy Care because it did not have the money it agreed to pay in the term sheet. Even if the term sheet constituted a Type II preliminary agreement, 37celsius cannot recover expectation damages because it cannot show Intel's alleged breach caused the deal to fall apart.

### C. 37celsius Cannot Show Damages.

There is another reason that 37celsius's claim fails: It is well settled that a plaintiff must show some damages to prevail on a breach of contract claim. *See Humanigen, Inc.*, 238 A.3d at 202. But the NDA prohibits recovery for expectation damages, and 37celsius provides no other argument for damages.

Beginning with expectation damages, the NDA 37celsius signed with Intel prohibits liability for "any costs or damages of any kind including … lost profits or loss of business, in connection with not moving forward to conclusion of the discussions or negotiations." The term sheet states that it is "subject to [the NDA] … which continues in full force and effect."

A contract can incorporate a separate document provided there is "an explicit manifestation of intent" to do so, as illustrated by "refer[ence] to another instrument and mak[ing] the conditions of such other instrument a part" of the agreement. *Town of Cheswold v. Central Del. Business Park*, 188 A.3d 810, 818–19 (Del. 2018) (citations omitted). 37celsius argues that the term sheet only incorporates the NDA as part of the Confidentiality provision, so the prohibition of expectation damages applies only to a claim for breach of confidentiality. If the "incorporated matter is referred to for a specific purpose only, it becomes a part of the contract for that purpose only, and should be treated as irrelevant for all other purposes." *Id.* at 819 (citation omitted). But the language of the term sheet does not limit the NDA's application to confidentiality—it states the NDA remains in full force and effect.

Nothing in the NDA itself suggests it is limited in the manner 37celsius posits. The NDA states that "[u]nder no

circumstances" will either party be liable for lost profits damages "in connection with not moving forward to conclusion of the discussions or negotiations." That language provides that the prohibition is applicable to any claim arising from the parties' failure to conclude their deal. 37celsius's reliance on Section 13(e) of the NDA stating that other agreements "will not be affected" by the NDA, cannot trump the term sheet's recognition and ratification of the NDA. The NDA was still in effect and, standing alone, prohibited either party from recovering expectation damages.

Having determined that 37celsius cannot recover expectation damages from Intel's alleged breach, the only remaining avenue to recovery on its contract claim is reliance damages. But 37celsius does not challenge the district court's ruling denying the availability of reliance damages. We will not second-guess an unchallenged ruling. *See Motorola Solutions, Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 494 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 1182 (2025) (failure to challenge on appeal ruling on theory of damages leaves that ruling intact). Without any damages, there is no liability for a breach of contract claim, and judgment for Intel is proper as a matter of law.

### III. Conclusion

For the reasons stated above, the judgment of the district court is AFFIRMED.